Argued September 14, affirmed November 4, petition for rehearing
denied December 15, 1964

SCOTT ET UX *v.* FREDERICKSEN

396 P. 2d 219

*Melvin Goode,* Albany, argued the cause for appellant. On the brief were Goode & Goode, Albany.

*Al J. Laue,* Salem, argued the cause for respondent. With him on the brief were Williams & Skopil, Salem.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

### GOODWIN, J.

The unpaid seller of corporate stock appeals from a decree denying relief and granting restitution to the purchasers under a conditional-sale contract.

This case began as an action by the purchasers to recover a down payment upon a contract to purchase one half of the stock in Free-Way-Bowl, Inc. The purchasers alleged that the seller wrongfully took possession of the corporate assets (a bowling alley) and ousted them from participation in the business. The purchasers alleged that they acquiesced in the seller's conduct, and were therefore entitled to treat the contract as rescinded.

The seller alleged by way of an equitable defense that the purchasers had defaulted in their performance of the contract. The seller prayed that the rights of the purchasers under the contract be terminated, that the bank which was holding the stock in escrow be directed to restore it to the seller, and that the seller be allowed, in accordance with the terms of the contract, to retain the down payment as liquidated damages for the breach thereof by the purchasers. The trial court found for the purchasers, and the seller appeals.

Since the record comes to us from the trial of the

equitable issues presented in the answer, we are obliged to treat the case as a suit and to try it *de novo* under ORS 17.440. We have done so, and have concluded that the evidence supports the trial court's view of the facts.

In summary, the material facts were these: The seller sold to the plaintiffs her stock in the corporation under a contract that resembled in some respects a conditional-sale contract for personal property and in some respects a land-sale contract. The purchasers paid $8,000 cash and gave a demand note for $2,000. The remainder of the purchase price of $46,000 was to be paid in installments. The parties apparently left for some future decision by the board of directors the respective duties of the parties in the operation of the corporation's business. The plaintiffs obtained the keys to the bowling alley and began to take an active role in the management. The owner of the remainder of the stock was not a party to this litigation. The record shows that he devoted some time to the bowling business, but he does not appear to have been the manager.

After about ten weeks of operation, the purchasers decided that they had made a bad bargain and turned the keys of the bowling alley over to the seller. The seller accepted the keys. There was no discussion of the contract at this time. There is no record that stock was ever discussed. A few weeks later the purchasers demanded the return of their down payment. This was refused.

The history of the entire transaction shows that the parties granted little or no recognition to the corporate entity. The purchasers and the seller's brother, who owned the other half of the stock, more or less took turns working at the bowling alley.

There is no evidence that the corporation, as such, ever had a meeting of its directors, or that the officers ever functioned as officers.

The seller, although she had sold her stock and had resigned as a director, remained active in the management of the business. She was not asked to participate; neither was she asked to desist. The ambiguity of the seller's relationship to the business may be explained in part by the fact that the contract made no provision for the duties of the respective parties in the management of the business. It may also be explained in part by the seller's financial interest in the success of the business in the hands of new and inexperienced proprietors. The seller wanted the business to prosper so that she would be paid.

In any event, the seller remained on the bowling-alley premises most of the time, and the purchasers began to have second thoughts about the bowling business. The purchasers became aware, some two or three weeks before they returned the keys to the seller, that the corporation was badly in need of capital. Their fellow shareholder offered to raise $15,000, and suggested that they raise a like amount, to keep the Brunswick Corporation, manufacturers of the bowling equipment, from repossessing the equipment.

The purchasers were unable to raise $15,000, or any part of that sum. After some delay, their fellow shareholder obtained all but $4,000 of the needed $30,000 from other sources, and the corporation borrowed $4,000 from the seller, who took a corporate note. The $30,000 was paid to the Brunswick Corporation, and disaster was temporarily averted. Nothing was decided among the shareholders, however, concerning the effect of the foregoing transactions upon capital,

corporate debt, or the individual rights and liabilities of shareholders personally.

At the time the purchasers withdrew from further participation in the management of the bowling alley, they were the equitable owners of one half (1200 shares) of the stock in the corporation, and held a proxy given by the legal owner of the stock (the seller) to vote those shares. The purchasers did not have a controlling interest in the corporation. The purchasers apparently were never elected as directors or officers, although the contract contemplated their election. With the management of the corporation thus wholly unsettled, the purchasers handed the keys to the bowling alley to the seller, but waited until later to ask for the return of their down payment.

The seller now contends that the return of the keys was a manifestation by the purchasers of abandonment of the contract, or, in other words, an unequivocal manifestation of intent not to perform the contract. The seller also contends that the purchasers were in default under the contract when they handed back the keys to the building. Since these two defensive theories are separate and distinct, we shall consider first the alleged abandonment.

■ We do not believe that the act of handing the keys to the seller was an unequivocal notice of an election to abandon the contract. On the contrary, the record as a whole tends to show that the act of handing the keys to the seller was an ambiguous act, probably a gesture of exasperation, and not necessarily an act related to the stock-purchase agreement. We agree with the trial court that the plaintiffs, as purchasers of corporate stock, should not be held to have forfeited their equity in the stock merely because of an act which may have reflected only their unhappiness with

the manner in which the business was being managed.

When the purchasers demanded the return of their down payment, the seller declared them in default under their contract to purchase stock. The seller's theory of default consisted of two points. First, the purchasers had not made their payment to the seller upon the demand promissory note for $2,000. Next, the seller contended that the failure of the purchasers to contribute the $15,000, as requested by their fellow shareholder, was a default under the contract.

If the purchasers did not abandon their contract rights, and we find nothing in the record to show an intent on their part to give up their equity in the 1200 shares of stock except in exchange for the return of their money, then the seller was not entitled to declare a forfeiture unless she could show that the purchasers were in default.

■ The plaintiffs were clearly not in default of any term of the contract with reference to the demand note. The seller may have had a cause of action upon the note, but a failure to pay the note was no breach of any term of the contract.

Neither were the plaintiffs in default under the contract when they failed to raise the $15,000 demanded of them in order to help stave off repossession. The contract bound the purchasers to save the seller harmless against the seller's personal liability as an endorser of certain corporate paper. But there is no evidence that the seller was ever called upon to make good on her personal guaranty of the corporation's contracts. The contract by which the purchasers acquired their stock did not require the purchasers to contribute additional capital or to maintain their capital interest at any particular percentage of the corporate capital.

■ The question of the seller being saved harmless was still anticipatory. Whatever the actions and omissions of the purchasers were, they did not constitute breaches of the contract at the time the seller attempted to declare a forfeiture. Accordingly, the attempt to declare a forfeiture was itself a breach of the contract. The purchasers were entitled to rescission and restitution. See *Johnston v. Gilbert,* 234 Or 350, 382 P2d 87 (1963).

There was evidence that the purchasers, who were unrepresented by counsel during the negotiation of the contract, did not know until after they had signed the contract that the corporation faced an immediate need for $30,000 in new capital to prevent the repossession of the bowling-alley equipment. The seller, flanked by attorneys and accountants at all times, was fully aware of these facts.

The evidence tended to show that the purchasers, had they been more astute, should have gleaned the relevant financial information from the bundle of documents placed before them before they agreed to buy stock, but the evidence also showed rather clearly that the seller made no effort to disclose anything that might discourage the sale. The purchasers have not, however, alleged fraud, but contend that it would be unjust to deny rescission and permit a forfeiture when the evidence shows a degree of overreaching.

What apparently happened in this case was that the seller, in her eagerness to find a buyer for one half of the stock in a corporation that badly needed capital, sold the stock to purchasers who were in no position to pour additional capital into the corporation. The trial court believed that the parties then agreed, by implication, if not expressly, to rescind the contract. We believe the record shows, not an agreed

rescission, but rather conduct on the part of the seller which entitled the purchasers to treat the contract as rescinded. In any event, the circumstances clearly do not make a proper case for a forfeiture.

Affirmed; neither party to recover costs.