Argued and submitted July 22, reversed and remanded with
instructions to enter a verdict and judgment in favor of defendant November 2,
reconsideration denied December 10, 1981,
petition for review denied January 12, 1982 (292 Or 356)

SALSBERY,
*Respondents,*

*v.*

FORD MOTOR CREDIT COMPANY,
*Appellant.*

(No. 79-8-486, CA 18609)

635 P2d 669

John M. Berman, Portland, argued the cause for appellant. With him on the briefs was Spears, Lubersky, Campbell & Bledsoe, Portland.

Morton A. Winkel, Portland, argued the cause and filed the brief for respondents.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

.

## VAN HOOMISSEN, J.

Defendant appeals a jury verdict awarding plaintiffs actual and punitive damages and attorney fees for alleged wrongful repossession of an automobile. The only issue we need to consider on appeal is whether the trial court erred in failing to direct a verdict in favor of defendant.

The evidence shows that on August 31, 1978, plaintiff LeRoy P. Salsbery purchased a new automobile from Webster Ford, Inc. on an instalment contract. Defendant subsequently purchased the Salsbery contract from Webster Ford. Under the terms of the contract, the first payment of $106 was due September 15. Thereafter, 47 equal monthly payments were due, commencing October 15. The September 15 payment and every payment thereafter was late, requiring continuous collection activity by defendant. Salsbery was off work from October or November, to just before Christmas, and he did not make a payment in November. He also was off work from March to June, 1979. Defendant was aware of those periods of unemployment.

Defendant has two-person units responsible for collections on contracts it purchases from Ford dealers. In this case, Leslie Marshall was responsible until the account was 30 days past due, and Jim Jensen was responsible when the account became more than 30 days past due.

The Salsbery account was first considered for repossession during April, 1979. On April 2, when the account was delinquent, Marshall called the Salsbery home. Salsbery was not there, and Marshall left a message asking him to call. On April 3, Marshall called again and spoke with Salsbery, who said he was mailing the March 15 payment that day; however, he did not do so. When no payment was received, Marshall tried to call Salsbery again on April 11, but there was no answer. On April 12, Salsbery told Marshall that his wife took care of making the payments but not to call her at work. Marshall told Salsbery that if the account was not straightened out by Monday, April 16, the car would be repossessed. Because the account was then more than 30 days delinquent, Marshall transferred it to Jensen. At that time Salsbery was

two payments behind. Marshall testified she felt the vehicle should have been repossessed then.

Jensen decided to make one final attempt to avoid repossession. On April 16, he called Salsbery. Salsbery told him that his wife had sent a check on April 15, but that he did not know if she had made one or two payments. Jensen told Salsbery if only one payment had been sent, the other, then due, should be paid in order to bring the contract current and to avoid a repossession. By mutual agreement the contract was then "extended."[1] Salsbery was explicitly advised by Jensen at that time that the extension was being given so the account could be made and kept current and that the next payment was due May 15. Salsbery testified he understood repossession was a possible consequence of his not making timely payments.[2] The file then went back to Marshall.

The payment due May 15 was not made on time. Marshall attempted to reach Salsbery's home on June 5, but there was no answer. As a result she sent a "cure letter," which stated in part:

"If the default is not cured or other acceptable arrangements are not made by the cure date [June 11], I will have to consider the alternatives, which may include repossession of the financed vehicle. * * *"

Marshall continued trying to contact Salsbery. She reached him at home on June 8. He told her he had a new job and that he would try to mail a payment that day after checking with his wife. He did not mail a payment that day; however, a payment was received June 13.

The next payment, due June 15, was not made on time. On July 3, Marshall again talked with Salsbery. She testified that he told her he got paid on Friday, July 6, and

---

[1] Exhibit 28 is an "extension" agreement signed by Salsbery and Marshall. The agreement permitted Salsbery to make the April 15, 1979, payment on October 15, 1982. A fee of $34.93 was assessed for this extension, which Salsbery paid on April 17, 1979.

[2] Salsbery bought a used car on time shortly before buying the new car from Webster Ford. He had trouble making the payments on it also. He refinanced the car in February, 1979. He later became involved in a dispute with that creditor, Associate Financial Services. He claimed that after making several payments he owed more than he had originally borrowed. He returned the vehicle to the finance company in May, 1979.

he would mail a payment that weekend. She expected payment to be received by Monday, July 9. Salsbery testified that he told Marshall he got paid on Saturday, July 7, and that he would not mail the check until Monday, July 9. He also testified that he in fact mailed a check Sunday night, July 8.[3]

On July 9, Marshall attempted to contact Salsbery. When there was no answer, she considered calling Mrs. Salsbery at work, but did not do so because she had been specifically told by Salsbery not to. At that time Marshall felt, as she had earlier in April, that because of the Salsberys' continuing financial problems the account would never become current, and she so informed Jensen.[4]

Defendant maintains a lockbox system for receipt of payments on its contracts. Payments mailed to the lockbox are delivered directly to the Bank of California, which processes and reports payments electronically to defendant. Each of defendant's branches is notified the following morning of payments received at the lockbox the day before. When no payment was received in the lockbox on Monday, July 9, or at the defendant's branch office on Tuesday, July 10, Jensen determined plaintiffs' automobile should be repossessed. Payment was received at defendant's lockbox on July 10. Jensen testifed that he would not have repossessed the vehicle if payment had been received on July 9.

Before authorizing repossession, Jensen had to obtain the approval of his supervisor, Honeycutt. After examining plaintiffs' payment record, Honeycutt noted that in spite of an extension the account continued to be delinquent. Seeing that a cure letter had been sent the month before warning of a possible repossession, and that the very next payment was late, he concluded the receipt of future payments was in doubt and the possibility of an ultimate

---

[3] On July 18, Salsbery's first lawyer wrote defendant that payment was mailed Monday, July 9. Salsbery also later told his second lawyer payment was mailed July 9, and the complaint so alleged until amended at trial.

[4] Based on his experience, Jensen had concluded by July 6, 1979, that Salsbery's car should be repossessed and he undertook on that date to initiate the necessary paperwork to accomplish the repossession.

loss probable.[5] After considering the number and nature of collection contacts with Salsbery, Honeycutt approved repossession, which was accomplished that night. Plaintiffs subsequently brought this action for wrongful repossession.

Under the terms of the contract, defendant had the right to repossess plaintiffs' automobile in the event defendant reasonably deemed the indebtedness insecure.[6] Such language in an instalment contract means that the creditor has the power to repossess if he believes in good faith that the prospect of payment or performance by his debtor is impaired. ORS 71.2080.[7] The burden of establishing lack of good faith was on plaintiffs. ORS 71.2080.

■ Defendant had ample basis for believing itself insecure. Every payment on the contract was late. This continuing delinquency required defendant to undertake continuous collection activity. Salsbery was off work from October or November, 1978, to just before Christmas. No payment was received in November of that year. Salsbery refinanced his other car with Associate Financial Services in February, 1979. He also was off work from March until June, 1979, and he had been untruthful in his representations about the March, 1979, payment. Salsbery knew

---

[5] Plaintiffs' brief asserts defendant knew there would be no chance of recourse against Webster Ford in the event of a deficiency on the contract because Webster had defaulted on an obligation to defendant, and defendant had repossessed vehicles from Webster's premises.

[6] Paragraph 19 of the contract provides:

"19. DEFAULT. .

"* * * In the event Buyer defaults in any payment * * * or Seller deems the property in danger of misuse or confiscation or Seller otherwise reasonably deems the indebtedness or the Property insecure, Seller shall have the right to declare all amounts due or to become due hereunder to be immediately due and payable and Seller shall have all the rights and remedies of a Secured Party under the Uniform Commercial Code, including the right to repossess the Property wherever the same may be found with free right of entry, * * *."

[7] ORS 71.2080 provides:

"A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised."

repossession was a possibility. He was warned specifically in April, that repossession was a possibility if he failed to keep his payments current. He insisted his wife made the payments but instructed defendant not to contact her at work when payments were late. In spite of an extension in April, the next payment was late. Salsbery returned another car to Associated Financial Services in May, 1979, after becoming involved in a dispute with them about his payments. Even after defendant sent Salsbery a cure letter giving him until June 11, to make a payment or other arrangements, his next payment was late. He told defendant he would try to make a payment June 8. He did not do so. That payment was not received until June 13. The next payment was not made when due. Salsbery was finally given a mandate to make a payment by Monday, July 9. He failed to do so, and defendant ordered the automobile repossessed on Tuesday, July 10. Additionally, as noted in plaintiff's brief, defendant had reason to believe it had no recourse against Webster Ford if Salsbery failed to make his payments. *See* n 7 *supra.*

These facts satisfy us that, as a matter of law, defendant was entitled to exercise its rights as an insecure secured creditor by repossessing plaintiffs' automobile. Therefore, the trial court erred by failing to direct a verdict in favor of defendant.

 We also find that as a matter of law plaintiffs failed to sustain their burden of proving defendant's lack of good faith. ORS 71.2080. To sustain that burden plaintiffs had to produce substantial evidence of defendant's lack of good faith. Good faith means honesty in fact in the conduct or transaction concerned. ORS 71.2010(19). Bad faith is synonomous with dishonesty. *Bank of California etc. v. Portland H & W Co.,* 131 Or 123, 138-39, 282 P 99 (1929). *See also Farmers Co-op El., Inc., Duncombe v. State Bank,* 236 NW2d 674, 678 (Iowa 1975); 69 Am Jur 2d, Secured Transactions, § 286 (1973). Our review of the record indicates that as a matter of law there is no substantial evidence that defendant acted in bad faith or that defendant's claim of insecurity was dishonest. For this further reason, we find that the trial court erred in failing to direct a verdict in favor of defendant.

Reversed and remanded with instructions to enter a verdict and judgment in favor of defendant.